## THE UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## TAMPA DIVISION

**ANTHONY CAMPBELL,**

    *Plaintiff,*

    v.

**CAPITAL COMMUNITY BANK, INC.,** and **CREDITNINJA LENDING, LLC,**

    *Defendants.*

Case No.:

## COMPLAINT AND DEMAND FOR JURY TRIAL

**COMES NOW**, the Plaintiff, **ANTHONY CAMPBELL** ("**Mr. Campbell**"), by and through his undersigned counsel, Seraph Legal, P.A., and complains of the Defendants, **CAPITAL COMMUNITY BANK, INC.** ("**CCB**") and **CREDITNINJA LENDING, LLC** ("**CreditNinja**"), (collectively, the "**Defendants**"), and in furtherance thereof states as follows:

## PRELIMINARY STATEMENT

1. This is an action brought by Mr. Campbell **against CreditNinja only** for violations of the **Electronic Funds Transfer Act**, 15 U.S.C. § 1693, *et seq.* ("**EFTA**") and the **Florida Consumer Collection Practices Act**, § 559.55, Fla. Stat., *et seq.* ("**FCCPA**"), and **against all Defendants** for violations of the **Racketeer Influence and Corrupt Organizations Act**, 18 U.S.C. § 1961, *et seq.* ("**RICO**") and the **Civil Remedies for Criminal Practices Act**, § 772.101, Fla. Stat. ("**CRCPA**").

## JURISDICTION AND VENUE

2.      Subject matter jurisdiction arises under the EFTA, 15 U.S.C. § 1693m(g), and RICO, 18 U.S.C. § 1965, as the EFTA and RICO are federal statutes.

3.      This Court has supplemental jurisdiction for Mr. Campbell's FCCPA and CRCPA claims under 28 U.S.C. § 1367.

4.      The Defendants are subject to this Court's jurisdiction pursuant to § 48.193, Fla. Stat. and Fed. R. Civ. P. 4(k).

5.      Venue is proper in the Middle District of Florida pursuant to 28 U.S.C. § 1391(b)(2) because the Defendants committed the acts of which Mr. Campbell complains within Polk County, Florida which is in the Middle District of Florida.

## PARTIES

### Mr. Campbell

6.      **Mr. Campbell** is a natural person over the age of eighteen residing in the city of Winter Haven, Polk County, Florida and is *sui juris*.

7.      Mr. Campbell is a *Consumer* as defined by the FCCPA, § 559.55(8), Fla. Stat.

### CCB

8.      **CCB** is a Utah corporation with a principal business address of 3280 N. University Avenue, Provo, UT 84604.

9.      CCB's Utah registered agent is Matthew Field, 3280 N. University Avenue, Provo, UT 84604.

## CreditNinja

10.     **CreditNinja** is a Delaware limited liability company with a principal business address of 222 S. Riverside Plaza, Suite 2200, Chicago, IL 60606.

11.     CreditNinja is registered to conduct business in the State of Florida, where its registered agent is Corporation Service Company, 1201 Hays Street, Suite A, Tallahassee, FL 32301.

12.     Per the State of Florida's Division of Corporations, CreditNinja was previously known only as KMD Partners, LLC ("KMD") prior to its application for a name change in December 2021.

## FACTUAL ALLEGATIONS

### CreditNinja Makes Illegal, Unenforceable Loan

13.     On or about April 24, 2025, CreditNinja made an $800 loan to Mr. Campbell through the online lending platform CreditNinja.com (the "**Loan**"). **SEE PLAINTIFF'S EXHIBIT A.**

14.     Mr. Campbell took out the Loan from his home in Florida and electronically signed the loan documents in Florida. **SEE PLAINTIFF'S EXHIBIT B.**

15.     CreditNinja transferred the Loan proceeds to Mr. Campbell's bank account that he maintains in Polk County, Florida, and debited payments from this same account.

16.    The stated annual percentage rate ("APR") for the Loan was 400.47%. **SEE PLAINTIFF'S EXHIBIT A.**

17.    In addition to the 400% interest rate, CreditNinja charged also charged a $40 "loan origination fee" which it deducted from Mr. Campbell's loan proceeds, resulting in him receiving only $760.

18.    On May 9, 2025, CreditNinja began withdrawing biweekly payments of $133.23 from Mr. Campbell's checking account he maintains in Florida.

19.    Mr. Campbell utilized the proceeds from the Loan for personal and household expenses.

20.    The balance on the Loan therefore meets the definition of *Debt* or *consumer debt* under the FCCPA, § 559.55(6), Fla. Stat.

21.    The State of Florida has long recognized that lending money at usurious interest rates is immoral, harmful, and contrary to public policy.[1]

22.    § 687.02(1), Fla. Stat. renders any loan or extension of credit made at annual interest rates over 18% per year usurious.

23.    § 687.071(2), Fla. Stat. renders any loan or extension of credit made at annual interest rates over 25% criminally usurious.

---

[1] E.g., "The effect of such a loan contract is to make it wholly void and subject to cancellation by a court of equity. Furthermore, the statute makes the lending of money on such terms a criminal offense and a contract of that nature is therefore void as against the public policy of the state as established by its Legislature." *The Richter Jewelry Co. v. Schweinert*, 125 Fla. 199, 220 (Fla. 1936).

24.    § 687.071(7), Fla. Stat. renders any criminally usurious loan void and unenforceable.

25.    Long-standing public policy in Florida confirms the impossibility of the alleged debt. *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935) (criminally usurious loans are "void as against the public policy of the state as established by its Legislature.").

26.    Any person who willfully makes a criminally usurious loan, in addition to subjecting themselves to criminal sanctions, forfeits the right to collect payment for the loan. *Richter Jewelry Co.*, 169 So. at 752.

27.    Indeed, even the recovery of a loan's principal balance when made at usurious rates is impermissible under Florida law. *Rollins v. Odom*, 519 So. 2d 652, 656 (Fla. 1st DCA 1988).

28.    The purpose of the usury statutes is to protect the needy borrower by penalizing the unconscionable money lender. *Stubblefield v. Dunlap*, 4 So. 2d 519 (Fla. 1941); *see also Pushee v. Johnson*, 166 So. 847 (Fla. 1936).

29.    Florida has taken usury one step further in the consumer loan context through its passage of the Consumer Finance Act, § 516, Fla. Stat. (the "Act").

30.    The Act requires licensure and state oversight for lenders issuing loans to Florida consumers in the amount of $25,000 or less. § 516.02(1), Fla. Stat.

31.    The Act further restricts the interest and fees which a licensed consumer finance company may charge.

32.    § 516.02(c), Fla. Stat. establishes that any loan which fails to comply with the Act is unenforceable in Florida *even if valid wherever made.*

33.    Florida has made it abundantly clear that to enforce a consumer loan against a Florida resident, a lender must be licensed in Florida and comply with the Act.

34.    Mr. Campbell's Loan charged an annual interest rate exceeding 25%, which is greater than the Act permits.

35.    CreditNinja is not a licensed as a Consumer Finance Company in Florida.

36.    The Loan is thus unenforceable against Mr. Campbell regardless of whether it was valid under Utah law or wherever else it might have been made.

37.    The Loan the Defendants issued to Mr. Campbell charged an annual percentage rate that vastly exceeds Florida's maximum lawful rate, therefore any attempts to collect the Loan's outstanding balance constitutes a felony pursuant to § 687.071(3), Fla. Stat.

38.    Because the Loan is subject to an annual interest rate which vastly exceeds the 25% limit § 687.071(2), Fla. Stat. proscribes, the Loan is void *ab initio* and unenforceable in Florida pursuant to § 687.071(7), Fla. Stat.

39.    The Loan and any balance due is therefore an *unlawful debt* pursuant to § 772.102(2)(a)(3), Fla. Stat.

40.    The fact that Mr. Campbell applied for the Loan from his home in Florida, signed all relevant documents in Florida, that CreditNinja issued the Loan to

Mr. Campbell while he resided in Florida, wired funds to his bank account in Florida, and sent collection correspondence to his home in Florida, establishes that the transaction occurred in Florida and is therefore subject to Florida law. *See California v. Iipay Nation of Santa Ysabel*, 898 F.3d 960 (9th Cir. 2018) and *Garn v. S. Fla. Stadium LLC,* No. 24-25087-CV, 2025 WL 1279071, at *2 (S.D. Fla. Mar. 26, 2025).

41.     Mr. Campbell and Defendants were bound by the contract when Mr. Loree took the last action to necessary to make the contract binding, clicking submit on his online application from his Florida home.

42.     Since the Loans had an interest rate exceeding 25% annually, CreditNinja had no legal right to collect any interest or principal from Mr. Campbell.

43.     The Defendants made multiple collection communications to Mr. Campbell while he was in Florida via e-mail and text message.

44.     These messages were each a "communication" per § 559.55(2), Fla. Stat.

45.     CreditNinja reported the Loan to Clarity Services ("Clarity"), a nationwide Credit Reporting Agency ("CRA"). **SEE PLAINTIFF'S EXHIBIT C.**

46.     In its reporting, CreditNinja stated it was the creditor, and made no mention of CCB. *Id.*

47.     CreditNinja also reported information to FactorTrust, another nationwide CRA, stating it was the creditor, and made no mention of CCB in its reporting, either:

| Company Name | Company ID | Company Contact | Credit Type | Date Opened | Date Last Reported | High Credit/Limit | Balance | Past Due Amt | Terms | Loan Status | Loan ID | Dispute Date |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CreditNinja Loan Servicing | 3838 | 200 S Riverside Plaza Suite 2200 Chicago, IL 60606 855-646-5201 support@creditninja.com | PD | 04/23/2025 | 05/23/2025 | $840.00 | $826.00 | $0.00 | 125 | Paid as agreed | 132159656 | |

## The Defendants' Rent-A-Bank Model

48.     CreditNinja, a Chicago-based "FinTech" business which makes loans to consumers at interest rates illegal in the vast majority of states, operates CreditNinja.com.

49.     CreditNinja Lending LLC owns the CreditNinja trademark, not CCB. **SEE PLAINTIFF'S EXHIBIT D.**

50.     The CreditNinja.com consumer website notes the content is "© 2025 CreditNinja Lending, LLC. All Rights Reserved." **SEE PLAINTIFF'S EXHIBIT E.**

51.     CreditNinja issues loans in its own name in states which do not strictly prohibit triple-digit interest rates for consumer loans.

52.     However, in States like Florida that render CreditNinja's interest rates criminally usurious, CreditNinja partners with CCB.

53.     CCB is state-chartered bank with a single branch in Utah, which has no maximum legal interest rate.

54.     12 U.S.C. § 1831d(a) permits a federally insured, state-chartered bank like CCB to export the interest rates of its home state.

55.     Purportedly, CCB originates the loan and then assigns or otherwise transfers the loan to CreditNinja, which then "services" the loan.

56.    CCB has no meaningful involvement in the lending process, as CreditNinja designs and manages all terms, underwriting criteria, interest rates, policies, procedures, and servicing for the loans, not CCB.

57.    Although the loan documents list CCB as the lender, CreditNinja is the true lender for the loans.

58.    An authorized representative from CreditNinja signs the agreement, not one from CCB. **SEE PLAINTIFF'S EXHIBIT A[2] and F.**

59.    CreditNinja provides the bulk of the capital to fund the loans and undertakes the risk should the loans fail to perform.

60.    CreditNinja simply provides CCB with a small, but guaranteed fee per loan in exchange for CCB providing its name and status as an FDIC-insured bank to CreditNinja.

61.    For its part in the process, CreditNinja receives the vast majority of the profits from the loans.

62.    Such arrangements are often referred to as "rent-a-bank" schemes.

63.    In a typical "rent-a-bank" scheme, the nonbank and its affiliates initiate the relationship, propose that the bank outsource all aspects of the loan process to the nonbank, the nonbank provides the factors necessary to issue the loans, and the nonbank then acquires the majority of the economic interest in the loans while providing a modest, but guaranteed profit for the bank with each loan.

---

[2] The IP Address for the lender representative signature (IP: 24.1.76.26) coincides with a location outside of Chicago, Illinois, not Utah.

64.    Tellingly, CCB generates the vast majority of its consumer lending business through "partnership" agreements with non-bank lenders like CreditNinja.[3]

65.    While such "rent-a-bank" schemes have several different variants, they all follow a similar framework:

a.    The design of the loan product, including the name of the product (e.g., CreditNinja Installment Loans) is proposed by a nonbank to the bank;

b.    The bank outsources all or nearly all factors of production concerning loans or lines of credit (i.e., marketing, underwriting, funding, and servicing);

c.    A single non-bank entity or group of entities manages these services (e.g., CreditNinja Lending and its related subsidiaries);

d.    Lead generation is the sole responsibility of the non-bank entity, who also pays the related costs;

e.    Credit criteria and underwriting are performed by the non-bank entity; technically, the bank sets its own standards, but those standards come directly from the non-bank entity and rubber-stamped by the bank;

f.    The bank issues the "final approval" of loans, but such approval is, again, a rubber-stamp approval of the findings of the non-bank entity;

g.    The bank is paid a series of small, but guaranteed fees, like a fee for each account opened, each account which remains open monthly, each

---

[3]As but one example, CCB serves as one of three sham lenders for OppLoans, marketed by Opportunity Financial, which makes short-term, unsecured loans to Florida consumers at roughly 150% interest rates.

incoming and outgoing payment, which loan re-financed, and so forth; and,

h.     There is a transfer of all or almost all of the credit risk on the loans either to the nonbank and related subsidiaries directly, or to third-party "investors" through transactions arranged by the nonbank.

66.     Essentially, the nonbank and its affiliates initiate the relationship, propose all aspects of the loan process be outsourced to it, provide all or nearly all of the factors necessary to make the loans, and then acquire most of the economic interest in the loans to facilitate the off-loading of those interests to a third party, creating a modest, but guaranteed, profit for the bank on each loan.

67.     When CreditNinja obtained a credit report from Clarity regarding Mr. Campbell in connection with his loan application, the company that Clarity listed as making the inquiry was "Credit Ninja/FMS." **SEE PLAINTIFF'S EXHIBIT G.**

68.     The inquiry did not mention CCB.

69.     As a result of the Defendants' collection efforts, Mr. Campbell has repaid money towards the void Loan.

70.     CreditNinja also made multiple other collection attempts via e-mail, text message, and postal mail in the last 24 months.

**CreditNinja Violates the EFTA By Requiring Electronic Payment**

71.    When Mr. Campbell applied for his Loan, CreditNinja required his to provide his bank account and routing numbers so CreditNinja could automatically debit payments from his bank account electronically.

72.    CreditNinja only accepts online applications, and the website will not allow an application to proceed without the consumer supplying his or his bank account information.

73.    When CreditNinja approved Mr. Campbell for a loan, it provided him with several documents to electronically sign, including a Loan Agreement and an "EFT Authorization Agreement."

74.    The "voluntary electronic debit payment authorization" includes a provision whereby CreditNinja required Mr. Campbell to consent to CreditNinja initiating ACH debits from his account to make the required bi-weekly loan payments.

75.    While couched as voluntary, CreditNinja will not approve a loan application which does not contain a signed, "voluntary" electronic payment agreement.

76.    Moreover, a consumer can only terminate the electronic funds transfer authorization *after* CreditNinja originates the loan.

77.    CreditNinja's business model of making unsecured subprime consumer loans depends on being able to debit loan payments concurrently to when the consumer receives his or his paycheck, thereby being the "first in line" to receive proceeds from the consumer's paycheck.

78.     Indeed, CreditNinja requires loan applicants to disclose their pay schedules to CreditNinja to facilitate CreditNinja's capture of payments.

79.     Under Regulation E, the implementing regulation of the EFTA, "[n]o financial institution or other person may condition an extension of credit to a consumer on the consumer's repayment by preauthorized electronic fund transfers...." 12 C.F.R. § 205.10(e)(1); 15 U.S.C. § 1693k(1).

80.     Despite the "voluntary" electronic payment agreement, in reality, CreditNinja conditioned the Loan's approval on Mr. Campbell's providing consent to ACH debits or debit card payments, as with all the other consumers it serves.

81.     Mr. Campbell has been damaged in that he made payments towards the Loan's outstanding balance, which is void and unenforceable pursuant to Florida law.

82.     Upon learning of the Loan's illegality and that he was a target of CreditNinja and CCB's scheme to issue usurious loans, Mr. Campbell suffered severe emotional distress.

83.     Mr. Campbell's credit scores have also been significantly impaired due to CreditNinja's reporting the Loan to the CRAs.

84.     Mr. Campbell has hired the undersigned law firm to represent his in this matter and has assigned it his right to fees and costs.

### COUNT I
### CREDITNINJA's VIOLATIONS OF THE
### FCCPA, § 559.72(9), FLA. STAT.

85.     Mr. Campbell incorporates Paragraphs 1 – 84 as if fully restated herein.

86. CreditNinja attempted to collect payments from Mr. Campbell towards the Loan's outstanding balance, thereby asserting they had the legal right to do so.

87. The Loan constitutes an unlawful debt pursuant to § 772.102(2)(a)(3), Fla. Stat.

88. Due to the Loan's illegal nature, CreditNinja had no legal right to collect its outstanding balance from Mr. Campbell.

89. CreditNinja's actions were willful, intentional, and performed with the express purpose of collecting an unenforceable debt from Mr. Campbell and profiting therefrom.

90. CreditNinja knew of the Loan's illegal nature, as they have gone to great lengths to avoid Florida law through their use of a "rent-a-bank" scheme.

**WHEREFORE**, Mr. Campbell respectfully requests this Honorable Court enter an award against CreditNinja for:

a. Actual damages pursuant to § 559.77(2), Fla. Stat.;

b. Statutory damages of up to **$1,000** pursuant to § 559.77(2), Fla. Stat.;

c. Reasonable costs and attorneys' fees pursuant to § 559.77(2), Fla. Stat.; and,

d. Such other relief that the Court deems just and proper.

**COUNT II**
**DEFENDANTS' JOINT & SEVERAL VIOLATIONS OF THE**
**CRCPA, § 772.103(3), FLA. STAT.**

91. Mr. Campbell incorporates Paragraphs 1 – 84 as if fully restated herein.

92.    Through their participation in the CreditNinja scheme, the Defendants constitute an "enterprise" under CRCPA, § 772.102(3), Fla. Stat.

93.    The Defendants each associated with the enterprise and participated in the enterprise's affairs, which existed for the purpose of collecting unlawful debt.

94.    The Defendants' participation in the enterprise violated § 772.103(3), Fla. Stat. and caused Mr. Campbell to repay amounts towards the unlawful Loan's outstanding balance.

    **WHEREFORE**, Mr. Campbell respectfully requests this Honorable Court enter an award against the Defendants, jointly and severally, for:

a.    Threefold the amount of actual damages, or, in the alternative, the statutory minimum of **$200**, whichever is greater, pursuant to § 772.104(1), Fla. Stat.;

b.    Reasonable costs and attorneys' fees pursuant to § 772.104(1), Fla. Stat.; and,

c.    Any other relief this Court deems equitable and proper under the circumstances.

### COUNT III
### DEFENDANTS' JOINT & SEVERAL VIOLATIONS OF THE CRCPA, § 772.103(4), FLA. STAT.

95.    Mr. Campbell incorporates Paragraphs 1 – 84 as if fully restated herein.

96.    The Defendants violated § 772.103(4), Fla. Stat. by conspiring with each other to issue and collect unlawful debts through CreditNinja.

97.　The Defendants each took actions in furtherance of this conspiracy.

98.　At various times, the Defendants have: (a) issued a loan to Mr. Campbell; (b) reported Mr. Campbell's Loan to Clarity; (c) initiated ACH deposits and withdrawals to and from Mr. Campbell's bank account; (d) sold credit reports to CreditNinja to assist in the loan application process; (e) attempted to collect the Loan's outstanding balance from Mr. Campbell via emails to Mr. Campbell; and/or (f) claimed ownership of CreditNinja.com to make it appear that a bank was the actual lender.

**WHEREFORE**, Mr. Campbell respectfully requests this Honorable Court enter an award against the Defendants, jointly and severally, for:

a.　Threefold the amount of actual damages, or, in the alternative, the statutory minimum of **$200**, whichever is greater, pursuant to § 772.104(1), Fla. Stat.;

b.　Reasonable costs and attorneys' fees pursuant to § 772.104(1), Fla. Stat.; and,

c.　Any other relief this Court deems equitable and proper under the circumstances.

## COUNT IV
## DEFENDANTS' JOINT & SEVERAL VIOLATIONS OF
## RICO, 18 U.S.C. § 1962(c)

99.　Mr. Campbell adopts and incorporates Paragraphs 1 – 84 as if fully restated herein.

100.    Through their participation in the CreditNinja scheme, the Defendants constitute an *enterprise* as defined by 18 U.S.C. § 1961(4).

101.    The Loan charged an interest rate far in excess of Florida's maximum permitted rate, and thus the Loan was an *unlawful debt* pursuant to 18 U.S.C. § 1961(6).

102.    CreditNinja operated CreditNinja.com, initiated ACH deposits and withdrawals to and from Mr. Campbell's bank account, and attempted to collect the Loan's outstanding balance from Mr. Campbell by reporting the Loan to CRAs.

103.    Clarity sold credit reports to CreditNinja regarding Mr. Campbell in order to assist with the review of his loan application and incorporated tradeline date regarding the Loan in reports they sold.

104.    CCB claimed ownership of CreditNinja.com loans to make it appear that a bank was the actual lender.

105.    The Defendants' participation in the enterprise violated 18 U.S.C § 1962(c) and caused Mr. Campbell to repay amounts towards the unlawful Loan's outstanding balance.

**WHEREFORE**, Mr. Campbell respectfully requests this Honorable Court enter judgment against the Defendants, jointly and severally, ordering:

a.    Threefold the amount of actual damages;

b.    Reasonable costs and attorneys' fees pursuant to 18 U.S.C § 1964(c);

c.    Any other relief this Court deems equitable and proper under the circumstances.

**COUNT V**
## DEFENDANTS' JOINT & SEVERAL VIOLATIONS OF RICO, 18 U.S.C § 1962(d)

106.    Mr. Campbell adopts and incorporates Paragraphs 1 – 84 as if fully restated herein.

107.    Through their participation in the CreditNinja scheme, the Defendants constitute an *enterprise* as defined by 18 U.S.C. § 1961(4).

108.    The Loan charged an interest rate far more than Florida's maximum permitted rate, and thus the Loan was an *unlawful debt* pursuant to 18 U.S.C. § 1961(6).

109.    The Defendants conspired with each other to issue and collect unlawful debts through CreditNinja in violation of 18 U.S.C § 1962(d).

110.    Total Loan and CreditNinja operated CreditNinja.com, initiated ACH deposits and withdrawals to and from Mr. Campbell's bank account, and attempted to collect the Loan's outstanding balance from Mr. Campbell by reporting the Loan to CRAS.

111.    Clarity sold credit reports to CreditNinja regarding Mr. Campbell in order to assist with the review of his loan applications and incorporated tradeline data regarding the Loan in reports sold regarding Mr. Campbell.

112.    CCB claimed ownership of CreditNinja.com loans to make it appear that a bank was the actual lender.

113.    The Defendants each agreed to participate in the conspiracy and agreed to its overall objective to collect unlawful loans through CreditNinja.

**WHEREFORE**, Mr. Campbell respectfully requests this Honorable Court enter judgment against the Defendants, jointly and severally, ordering:

a.      Threefold the amount of actual damages;

b.      Reasonable costs and attorneys' fees pursuant to 18 U.S.C § 1964(c);

c.      Any other relief this Court deems equitable and proper under the circumstances.

## COUNT VI
## CREDITNINJA's VIOLATIONS OF THE
## EFTA, 15 U.S.C. § 1693k(1)

114.    Mr. Campbell incorporates Paragraphs 1 – 84 as if fully restated herein.

115.    CreditNinja conditioned the approval of the Loan on Mr. Campbell's agreeing to make electronic payments in violation of 15 U.S.C. § 1693k(1).

116.    Accordingly, CreditNinja is liable to Mr. Campbell for his actual damages, statutory damages of $1,000, costs, and attorneys' fees pursuant to 15 U.S.C. § 1693m(a)(2)(A).

**WHEREFORE**, Mr. Campbell respectfully requests this Honorable Court enter judgment against CreditNinja for:

a.      Statutory damages of **$1,000** pursuant to 15 U.S.C. § 1693m(a)(2)(A);

b.      Actual damages pursuant to 15 U.S.C. § 1693m(a)(2)(A);

c.      Reasonable costs and attorneys' fees pursuant to 15 U.S.C. § 1693m(a)(2)(A); and,

d.      Such other relief that this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Mr. Campbell hereby demands a jury trial on all issues so triable.

Respectfully submitted on October 8, 2025, by:

SERAPH LEGAL, P. A.

/s/ Christian E. Cok
Christian E. Cok, Esq.
Florida Bar No.: 1032167
CCok@SeraphLegal.com
2124 W Kennedy Blvd., Suite A
Tampa, FL 33606
Tel: 813-567-1230 (ext. 307)
Fax: 855-500-0705
Attorney for Plaintiff

**EXHIBIT LIST**

A.  Mr. Campbell's CreditNinja Installment Loan Agreement, April 24, 2025 – Excerpt
B.  Mr. Campbell's IP Address Showing Location of Loan Application
C.  Mr. Campbell's Clarity Consumer Disclosure, August 30, 2025, CreditNinja Tradeline - Excerpt
D.  KMD's Trademark Registration for CreditNinja
E.  CreditNinja.com's Statement: "© 2025 CreditNinja Lending LLC. All Rights Reserved."
F.  Lender Representative IP Address Showing Chicago Location
G.  Mr. Campbell's Experian Consumer Disclosure, August 30, 2025, CreditNinja Inquiry - Excerpt